IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

CARLISH SHABAZZ PARKER (1),
LAMAR COOPER (2),
JIMMY RUCKER, JR. (3), and
THOMAS JACKSON (5),

          Defendants.

CRIMINAL CASE NO.

1:10-CR-0176-JEC-JFK

## **REPORT AND RECOMMENDATION**

Pending before the court is Defendant Lamar Cooper's motion [Doc. 85] to suppress statements and motion [Doc. 86] to suppress evidence, as well as Defendant's supplemental motion [Doc. 112] to suppress evidence and statements,[1] and Defendant Jimmy Rucker's motion [Doc. 63] to suppress evidence.  An evidentiary hearing was held on Defendants Cooper's and Rucker's motions to suppress on July 29, 2010.[2] [Doc. 110].  And pending before the court is Defendant Thomas Jackson's motion

---

[1]This filing is actually mislabeled and is Defendant's post-hearing brief in support of the previously filed motions to suppress.

[2]Citations to the transcript are:  (Tr. at ).

[Doc. 82] to suppress tangible and derivative evidence seized pursuant to a search warrant.  The Government opposes the motions to suppress.  [Doc. 116].

## Defendants Cooper's and Rucker's Motions to Suppress

Defendant Cooper seeks to suppress evidence obtained from a search of his vehicle following a stop of the vehicle on April 7, 2010, and to suppress statements that he made during the stop.  [Doc. 112].  Defendant Rucker, a passenger in the vehicle, also seeks to suppress evidence obtained as a result of the stop of the vehicle. [Doc. 115].  The Government opposes the motions to suppress asserting that the stop of the vehicle was based on reasonable suspicion, that the search of the vehicle was based on probable cause and was a lawful consent search, and that Defendant Cooper's statements are admissible.  [Doc. 116 at 2-47].

I.     Facts

On April 6, 2010, a confidential source ("CS") provided information to law enforcement authorities concerning his source of cocaine, an individual identified as Carlish Parker.[3]   (Tr. at 19).   Law enforcement officers monitored telephone conversations between the CS and Parker discussing arrangements for Parker to broker a multi-kilogram cocaine transaction with a buyer, an associate of the CS but actually

---

[3]Parker is a co-Defendant in this case.  [Doc. 1].

2

an undercover officer.  (Tr. at 5, 19).  Arrangements could not be finalized for the 6th;

therefore, Parker told the CS to contact him before 11:00 a.m. on April 7.  (Tr. at 19-

20).  On the 7th, the CS and Parker spoke on the telephone, and Parker advised the CS

that things looked good and that the transaction would take place at 2626A Tempo

Hallmark Apartments at 12:30 p.m.  Parker stated that he was leaving to go to the

location.  (Tr. at 19-20).

Surveillance was set up at the apartment complex located off of Buford Highway

by officers with the DeKalb County Police Department.  Detective Pitts observed

Parker arrive at approximately 12:20 p.m. in a blue four-door Mercury Grand Marquis.

Parker exited the vehicle and entered apartment A in building 26.  (Tr. at 5-6, 20-21,

26).  Another surveillance officer, Detective Donahue, armed with video-recording

equipment, arrived just after Parker entered the apartment, which was pointed out to

him by Detective Pitts.  (Tr. at 4-6).  Parker and the CS had another telephone

conversation, and Parker advised the CS that the source of the cocaine was not there

but would be arriving in about ten minutes.  (Tr. at 7, 16-17, 21).

In approximately ten minutes, at 12:38 p.m., a black Lincoln Continental arrived

in the apartment complex, occupied by two African-American males, and parked near

Parker's Mercury Grand Marquis.  (Tr. at 7, 10, 22).  The men exited the vehicle and

3

opened the trunk of the Lincoln, removing two duffle bags. Each man carried one of the duffle bags, which appeared to have weight indicating contents, and entered the same apartment as previously entered by Parker. (Tr. at 7-10, 12, 22; Gov't Ex. 1). About fifteen to twenty minutes after the men who arrived in the Lincoln entered the apartment, Parker called the CS, asked when he would arrive, and advised that everything is here. He stated, "I got five." (Tr. at 22-23). Parker wanted the CS and his buyer to come to the apartment to conduct the transaction. (Tr. at 23).

Due to law enforcement safety concerns, the officers were not going to conduct the transaction in the apartment, and the CS attempted to negotiate with Parker a new location, across the street from the apartment complex, to conduct the deal. (Tr. at 23-24). When new arrangements could not be agreed upon, the officers directed the CS to stop communicating with Parker. (Tr. at 24). The officers decided to stop communicating with Parker and, when the men with the drugs left the apartment, to stop the vehicle with the drugs. (Tr. at 24-25, 33).

At approximately 2:15 p.m., Detective Donahue observed the same two men, who had arrived in the Lincoln, exit the apartment each carrying one of the same duffle bags, still appearing to contain items, and return the duffle bags to the trunk of the

4

Lincoln.[4]  (Tr. at 11-13; Gov't Ex. 1).  The men entered the vehicle and attempted to leave the complex.  (Tr. at 13-14, 25).  As the Lincoln neared the exit of the complex, using blue lights but no sirens, at least two marked police vehicles and three uniform DeKalb County officers conducted an investigative or tactical stop of the Lincoln.[5] (Tr. at 25, 36-39, 53-54).  One patrol vehicle blocked the Lincoln in the front, and one patrol vehicle blocked the Lincoln in the rear.  (Tr. at 38).  As the officers conducted the stop and until the two occupants were secured, the officers' firearms were drawn. (Tr. at 43-44, 54).

Detective Gordon Morrison, who was the only officer to place hands on either of the vehicle's occupants, first approached the front passenger side of the Lincoln and removed an African-American male identified as Defendant Rucker.  (Tr. at 28, 37, 39, 54).  As Rucker was getting out of the vehicle, Detective Morrison observed a handgun, a .45 caliber Glock, wedged between the passenger seat and the center console.[6]  (Tr. at 39-40).  The detective handcuffed Rucker and advised him that he

---

[4]He had not observed either the men or the duffle bags leave the apartment at any other time.  (Tr. at 11).

[5]A total of five or six officers were in the area of the stop.  (Tr. at 38-39).

[6]The firearm was left in the vehicle at that time.  (Tr. at 40, 52-53).  Detective Morrison advised that, prior to the stop, he had no information that a weapon was in

was being detained for investigation.  He was not advised of his <u>Miranda</u> rights.[7]  (Tr. at 39).  Detective Morrison then walked around to the driver side door and removed the second African-American male, identified as Defendant Lamar Cooper and the owner of the Lincoln, from the vehicle.  (Tr. at 27-28, 37, 40, 54-55).  Detective Morrison handcuffed Cooper and walked with him approximately fifteen feet away from the vehicle.  (Tr. at 40-41, 54-55).  The detective stated that Cooper was not under arrest and stated, "[I]t was clear that we were detaining him because that's the actual words I told him."  (Tr. at 41, 56).  Cooper was not advised of his <u>Miranda</u> rights.  (Tr. at 41).

Detective Morrison then asked Cooper if there was anything in the vehicle, and Cooper responded, "yes."  (Tr. at 41, 55).  The detective asked, "guns?" To which, Cooper said, "no."  But when asked, "drugs?", Cooper responded, "yes."  (Tr. at 41, 55).  Detective Morrison asked how much, and Cooper responded, four, clarifying, four kilograms of cocaine.  (Tr. at 41-42, 55).  The detective then asked if he could "get them," that is, search the vehicle and remove the drugs.  And Cooper responded,

---

the vehicle or that anyone had a weapon but that he assumed that a weapon was present due to the suspected drug transaction.  (Tr. at 57-58).

[7]There is no evidence in the record that Rucker made any statements or that any items of an evidentiary nature were recovered from his person.

6

"yeah." (Tr. at 42, 44, 55).  Detective Morrison stated that, while speaking with Cooper and asking for consent, his tone of voice was "very laid back" and that Cooper appeared "deflated."  (Tr. at 42).  The detective stated that Cooper appeared to understand him and was responsive to his questions. (Tr. at 43-45).  Cooper was not threatened and did not appear to be under the influence of drugs or alcohol. (Tr. at 43-44).  During the conversation with Cooper, no weapons were drawn, and Detective Morrison stated that he never pointed his weapon at Cooper. (Tr. at 43-44).  Cooper never withdrew his consent or attempted to stop the search. (Tr. at 45).  At this point, approximately five minutes had elapsed from the time of the stop of the Lincoln. (Tr. at 52).

Detective Morrison, who is also a K-9 handler and who had his drug certified K-9, Luca, with him, went to his patrol vehicle to retrieve Luca in order to conduct an examination of the Lincoln.[8] (Tr. at 36, 46-47).  When Luca was presented to the exterior of the Lincoln, the K-9 alerted to the odor of controlled substances in the trunk. (Tr. at 49).  The detective opened the trunk, and based on his training and

---

[8]Detective Morrison provided details of his and Luca's certification and stated that Luca was certified to detect the odors of four controlled substances, cocaine, methamphetamine, heroin and marijuana. (Tr. at 46-48).  Luca is a passive indicator meaning the K-9 alerts to the odor of a controlled substance by stopping and sitting or lying down. (Tr. at 48).

experience, he detected the odor of raw marijuana.  (Tr. at 49-50).  Luca jumped into the trunk and alerted to the odor of controlled substances in the black duffle bag.  (Tr. at 49-51).  After returning Luca to the patrol vehicle, Detective Morrison opened the duffle bag and found five kilograms of cocaine.  In the other duffle bag, he found a money counter, a large amount of U.S. Currency, and a receipt from Kauffman Tire in Cooper's name.  (Tr. at 51).  The entire encounter lasted approximately fifteen minutes and was witnessed by civilians in the area – at a distance of approximately twenty-five yards.  (Tr. at 51, 59-60).

Additional facts will be set forth as necessary during discussion of Defendants' claims.

## II.    Discussion

As noted, Defendants Cooper and Rucker contend that the stop of the Lincoln and their detention was unlawful because the officers did not have reasonable suspicion.  [Doc. 112 at 5-6; Doc. 115].  Defendant Cooper also contends that the search of the Lincoln was without probable cause or consent and that his statements are inadmissible because he was not advised of his Miranda rights.  [Doc. 112 at 3-6].  Both Defendants seek suppression of all evidence and statements obtained as a result of the stop, search and detention.  [Docs. 112, 113].

8

### a.    Expectation of Privacy

Defendant Rucker correctly identified both in his motion [Doc. 63] to suppress and at the evidentiary hearing (Tr. at 61-62) that pursuant to the Supreme Court decision in Brendlin v. California, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007), his challenge to the stop and search is limited.  In Brendlin, the Supreme Court held that a passenger in an automobile, stopped as the result of a traffic offense, is seized the same as the driver.  Accordingly, a passenger in a vehicle stopped for a traffic offense may challenge the constitutionality of the stop.  551 U.S. at 256-59, 263, 127 S. Ct. 2406-08, 2410.  Defendant Rucker may therefore challenge the recovery of any evidence off his person or statements made as a result of the stop.  There is no evidence in the record that any such evidence was seized or statements made.  However, because Defendant Rucker has not established a legitimate expectation in the Lincoln, he may not challenge the search of the Lincoln which resulted in the seizure of the firearm or of the drugs and other items from the trunk.[9]  See United States v. Lee, 586 F.3d 859, 864-65 (11th Cir. 2009) ("We have held that a 'passenger[ ] in a private car, . . . who has no possessory interest in the automobile, does not have

---

[9]Defendant has not identified any other fruits of the stop which might be subject to suppression.

a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car.'") (citations omitted).

For this reason, Defendant Rucker's motion to suppress should be denied; however, even if the merits of Defendant's motion are considered – as is true of Defendant Cooper's motion to suppress evidence, the motions should be denied because the stop and search were lawful.

### b.   Investigative Stop

Law enforcement agents may briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal activity. See Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008) (same). Under the Terry rationale, a law enforcement officer may also conduct a brief investigatory stop of a vehicle, if he is "'able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" United States v. Benitez-Macedo, 129 Fed. Appx. 506, 511 (11th Cir. 2005) (quoting Terry, 392 U.S. at 21, 88 S. Ct. at 1880); see also United States v. Webster, 314 Fed. Appx. 226, 228 (11th Cir. 2008) (a Terry stop "includes the right to stop a moving vehicle, . . . and also

10

includes investigations of past crimes"); <u>United States v. Mikell</u>, 102 F.3d 470, 474

(11th Cir. 1996) ("[T]he police may stop a car and briefly detain it and its occupants in

order to investigate a reasonable suspicion that such persons are involved in criminal

activity.").

 "[T]he 'reasonableness' standard requires that a police officer 'be able to point

to specific and articulable facts, which, when taken together with rational inferences

from those facts, reasonably warrant that intrusion.'" <u>Mikell</u>, 102 F.3d at 474-75

(citing <u>Terry</u>, 392 U.S. at 21, 88 S. Ct. at 1880); <u>see also</u> <u>United States v. Blackman</u>,

66 F.3d 1572, 1576 (11th Cir. 1995) ("The reasonableness of the officers' conduct must

be judged against an objective standard:  would the facts available to the officer at the

moment of the seizure or search warrant a man of reasonable caution in the belief that

the action taken was appropriate.") (citations omitted and internal quotation marks

omitted).  Such brief investigatory stops do not require probable cause, and the

determination as to the validity of the stop is based on a consideration of the totality

of the circumstances.  <u>See</u> <u>United States v. Sokolow</u>, 490 U.S. 1, 7, 109 S. Ct. 1581,

1585, 104 L. Ed. 2d 1 (1989), <u>see also</u> <u>United States v. Nunez</u>, 455 F.3d 1223, 1226

(11th Cir. 2006) (reasonable suspicion is based on the totality of the circumstances and

collective knowledge of officers).  "'[R]easonable suspicion' must be more than an

inchoate 'hunch,' and the fourth amendment accordingly requires that police articulate some minimal, objective justification for an investigatory stop." United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990) (quoting Sokolow, 490 U.S. at 7, 109 S. Ct. at 1585); accord United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007).

Although, in determining whether the agents and officers had a reasonable suspicion to detain the occupants of the vehicle, a court "must give due weight to the officer's experience[,]" United States v. Briggman, 931 F.2d 705, 709 (11th Cir. 1991), and to "'consideration of the modes or patterns of operation of certain kinds of lawbreakers[,]'" United States v. Gonzalez, 70 F.3d 1236, 1238 (11th Cir. 1995) (citation omitted), there still must be "'some minimal level of *objective* justification'" for a Terry stop, Sokolow, 490 U.S. at 7, 109 S. Ct. at 1585 (citation omitted and emphasis added). See also Lindsey, 482 F.3d at 1290 ("'[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity,' . . . even if such activity is 'seemingly innocuous to the ordinary citizen'") (citations omitted).

The Supreme Court has adopted a dual inquiry for evaluating the reasonableness of an investigative stop. The reviewing court is to examine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S.

12

at 20, 88 S. Ct. at 1879; accord United States v. Sharpe, 470 U.S. 675, 682, 105 S. Ct. 1568, 1573, 84 L. Ed. 2d 605 (1985).  In this case, both of these inquiries are satisfied.

The officers had a reasonable suspicion that Defendants were engaging in criminal activity.  At the time of the stop of the vehicle and the detention of Defendants Cooper and Rucker, the officers were aware of the following facts.  Due to monitored conversations between Carlish Parker and a CS, the officers knew that a drug transaction involving five kilograms of cocaine was to take place at approximately 12:30 p.m., on April 7, 2010, at 2626A Hallmark Apartments, located off of Buford Highway.  (Tr. at 5-6, 16, 19-22).  Surveillance officers observed Parker, who was brokering the deal, arrive at the location and enter apartment A; after which, he contacted the CS and advised that, although the source of the drugs was not present, the source was to arrive in about ten minutes.  (Tr. at 5, 7, 16-17, 20-21).  The officers then observed Defendants Cooper, driving, and Rucker, the passenger, arrive in the Lincoln and park near Parker's vehicle.  (Tr. at 7, 17, 22, 26-28).  After Cooper and Rucker exited the Lincoln, they retrieved two duffle bags, appearing to have contents, from the trunk, and each Defendant carried one duffle bag into the same apartment Parker had previously entered.  (Tr. at 7-11, 22; Gov't Ex. 1).  Shortly thereafter, Parker called the CS and advised that everything is here.  "I got five."  (Tr. at 22-23).

13

Because the officers, for safety reasons, did not want to conduct the transaction in the apartment, the CS attempted to have the deal moved across the street from the apartment complex but was unsuccessful. (Tr. at 23-24). At the officers' direction, he stopped communicating with Parker, and the officers decided to wait until the source left with the drugs and to conduct a stop of the vehicle, the Lincoln. (Tr. at 24-25, 33). At approximately 2:15 p.m., surveillance agents observed Defendants Cooper and Rucker exit the apartment, each carrying a duffle bag, both which appeared to still have contents, and return to the Lincoln. The duffle bags were placed back in the trunk. (Tr. at 11-13, 25; Gov't Ex. 1). Officers did not see Defendants or the bags leave the apartment at any other time. (Tr. at 11). Defendants then attempted to leave the complex in the Lincoln but were detained by law enforcement officers. (Tr. at 13-14, 25, 38).

These facts establish "'specific and articulable facts, which, taken together with rational inferences from those facts,'" demonstrate that the officers had a reasonable suspicion that Defendants were engaged in criminal activity, that is, the aborted drug transaction. Benitez-Macedo, 129 Fed. Appx. at 511 (quoting Terry, 392 U.S. at 21, 88 S. Ct. at 1880). In Nunez, the Eleventh Circuit Court of Appeals found that the facts, involving the removal of containers capable of concealing controlled substances

14

from a suspected marijuana grow house and placing those containers in vehicles leaving the residence, established probable cause to support an investigative detention of the vehicles.  455 F.3d at 1226.  The court stated, "That these containers were removed from a residence for which a law enforcement officer had probable cause to believe was a marijuana grow house – while the residence was under surveillance and shortly before it was to be searched – supports a reasonable suspicion that [the defendants] were involved and were removing marijuana or related contraband from the Residence."[10] Id.

And the stop "was reasonably related in scope to the circumstances which justified the interference in the first place."  Terry, 392 U.S. at 20, 88 S. Ct. at 1879. Several factors are addressed in evaluating this inquiry, including: the law enforcement purposes to be served by the stop, the time needed to effectuate those purposes, the officers' diligence in pursuing the investigation, and the scope and intrusiveness of the detention.  See Sharpe, 470 U.S. at 685, 105 S. Ct. at 1575; United States v. Hardy, 855 F.2d 753, 759 (11th Cir. 1988).  And, "the most important factor 'is whether the police detained [Defendant] to pursue a method of investigation that was likely to

---

[10]The court notes that the officers in this case likewise obtained a search warrant for the apartment in which the drug transaction was to have taken place.  [Doc. 116, Ex. A].

15

confirm or dispel their suspicions quickly, and with a minimum of interference.'"

United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000) (quoting Hardy, 855 F.2d

at 759).

Defendants' detention lasted only fifteen minutes, during which Detective

Morrison removed Defendants from the vehicle and secured Defendants with

handcuffs and then briefly spoke with Defendant Cooper asking him questions about

the contents of the Lincoln, that is, were there drugs or guns in the vehicle.[11]   (Tr. at

38-42, 51-52, 54-55).  Defendant responded affirmatively to the question about drugs

and advised that there were four kilograms in the vehicle.  (Tr. at 41-42).  Once he had

that information, the detective asked for and received consent to search the Lincoln,

and after the K-9 alerted to the trunk, he immediately searched the duffle bags finding

the controlled substances and related contraband.  (Tr. at 42, 45-51).  Given the

important law enforcement purposes served by the stop, that is, interdicting drug

traffickers, the short and minimal intrusion, which quickly resulted in confirming the

officers' beliefs, did not exceed the bounds of a Terry stop.

The officers conducted a lawful Terry stop.

---

[11]Securing Defendants with handcuffs and asking whether there were firearms
in the vehicle were reasonable actions due to the detective having observed the
handgun in the passenger compartment.  (Tr. at 39).

16

c.      **Search of Vehicle**

Although Defendant Cooper offers no substantive argument in support of his claim that the search of the Lincoln was unlawful – beyond the claim that the stop and detention were unlawful, he asserts that there was neither probable cause nor consent for the search.  [Doc. 112 at 5-6].  Defendant is wrong.

As a general rule, the Fourth Amendment requires police officers to obtain a warrant before conducting a search.  See California v. Carney, 471 U.S. 386, 390-91, 105 S. Ct. 2066, 2069, 85 L. Ed. 2d 406 (1985).  In Carroll v. United States, 267 U.S. 132, 153, 45 S. Ct. 280, 285, 69 L. Ed. 543 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving vehicles.  Under the "automobile exception," "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."  Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S. Ct. 2485, 2487, 135 L. Ed. 2d 1031 (1996); see also Lindsey, 482 F.3d at 1293 ("The requirement of mobility is satisfied merely if 'the automobile is operational.'") (citation omitted); United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006) (indicating that "readily mobile" means "operational").  No separate exigent circumstances need to be shown.  See Maryland v. Dyson, 527 U.S. 465, 466, 119 S.

Ct. 2013, 2014, 144 L. Ed. 2d 442 (1999); <u>Lindsey</u>, 482 F.3d at 1293 (noting there is no requirement that the search occur contemporaneously with the vehicle's seizure or that any other exigent circumstances exist); <u>United States v. Watts</u>, 329 F.3d 1282, 1286 (11th Cir. 2003) ("[T]his Court made it 'clear that the requirement of exigent circumstances is satisfied by the ready mobility *inherent* in all automobiles that reasonably appear capable of functioning.'") (quoting <u>United States v. Nixon</u>, 918 F.2d 895, 903 (11th Cir. 1990)) (emphasis in original).  As the Lincoln was stopped while Defendants were attempting to leave the complex, there is no doubt of its mobility.

The validity of the search turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime.  <u>Dyson</u>, 527 U.S. at 466, 119 S. Ct. at 2014; <u>see also</u> <u>Lindsey</u>, 482 F.3d at 1293 ("The key issue here is whether the police had probable cause for the search and seizure of the vehicle.").  "Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>United States v. Magluta</u>, 418 F.3d 1166, 1182 (11th Cir. 2005) (citations and internal

18

quotation marks omitted).  Probable cause is established in this case by the facts leading up to the stop and the alert by the drug certified K-9, Luca.[12]

As already outlined, the officers had reasonable suspicion to believe Defendants were participants in the aborted drug transactions, actually the suppliers of the controlled substances, which had been returned to the Lincoln once the deal was cancelled.  And the alert of the drug certified K-9, which alone would have established probable cause, only cemented the officers' belief that the cocaine was in the Lincoln. The dog sniff of the exterior of the vehicle did not constitute a search.  See United States v. Nelson, 309 Fed. Appx. 373, 375 (11th Cir. 2009); United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998) (citing United States v. Place, 462 U.S. 696, 707, 103 S. Ct. 2637, 2645, 77 L. Ed. 2d 110 (1983)).  And the alert by the trained narcotic detector dog provided probable cause for the subsequent search of the Lincoln and the contents, the duffle bags.  See Nelson, 309 Fed. Appx. at 375[13]; Glinton, 154 F.3d at 1257.

---

[12]The court, in resolving this issue, is not considering Defendant's admission that the vehicle contained four kilograms of cocaine.  (Tr. at 41-42).

[13]The evidence presented at the hearing established that both Detective Morrison and Luca were "'well-trained.'"  Nelson, 309 Fed. Appx. at 375 (citation omitted).

The seizure of the firearm from the passenger compartment also falls within the finding of probable cause or within the definition of a plain view seizure. <u>See</u> <u>United States v. Hromada</u>, 49 F.3d 685, 690 n.11 (11th Cir. 1995) ("An officer may seize evidence that is in plain view despite the failure to obtain a search warrant if two elements are satisfied: (1) lawful access to the object seized, and, (2) the incriminating nature of the object seized is immediately apparent."); <u>United States v. Smith</u>, 918 F.2d 1501, 1509 (11th Cir. 1990)(the incriminating nature of the firearm was readily apparent in a drug investigation because firearms are "'tools of the trade'") (citation omitted). The seizure of the firearm from the passenger compartment is also justified as a search incident to arrest for the drug offenses. <u>See</u> <u>Arizona v. Gant</u>, __ U.S. __, __, 129 S. Ct. 1710, 1719, 173 L. Ed. 2d 485 (2009) (the search is justified pursuant to <u>Gant</u>'s alternative basis for allowing a search of a vehicle incident to arrest, that is, because it was reasonable for the officers arresting Defendants Cooper and Rucker to believe the passenger compartment of the vehicle contained evidence of the offenses for which Defendants were arrested).

Because there is no basis for finding that the automobile exception to the warrant requirement does not apply in this case, the court will not address the issue of

20

Defendant's consent for the search.  The search of the Lincoln and seizure of the drugs, contraband and firearm did not violate Defendant's Fourth Amendment rights.

###### d.   Statements

Defendant Cooper also contends that the statements he made to Detective Morrison during the investigative detention are not admissible because he was not advised of his <u>Miranda</u> rights.  [Doc. 112 at 3-5].  While the Government concedes that Defendant was subjected to interrogation, the Government opposes suppression of the statements asserting that Defendant was not in "custody" requiring that he be advised of his rights.  [Doc. 116 at 30-45].  The Government is correct.

In <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the Supreme Court held that "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" <u>Stansbury v. California</u>, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528, 128 L. Ed. 2d 293 (1994) (quoting <u>Miranda</u>, 384 U.S. at 444, 86 S. Ct. at 1612).  The Supreme Court recently clarified "that the freedom-of-movement test identifies only a necessary and not a sufficient condition

21

for <u>Miranda</u> custody."  <u>Maryland v. Shatzer</u>, __ U.S.  __, __, 130 S. Ct. 1213, 1224, _ L. Ed. 2d __ (2010).  The Court stated, "We have declined to accord it 'talismanic power,' because <u>Miranda</u> is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'"  <u>Id.</u> at __, 130 S. Ct. at 1224 (quoting <u>Berkemer v. McCarty</u>, 468 U.S. 420, 437, 104 S. Ct. 3138, 3148-49, 82 L. Ed. 2d 317 (1984)).  Accordingly, "[a]n officer's obligation to administer <u>Miranda</u> warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'"  <u>Stansbury</u>, 511 U.S. at 322, 114 S. Ct. at 1528 (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714 (1977) (per curiam)); <u>accord</u> <u>United States v. Brown</u>, 441 F.3d 1330, 1347 (11th Cir. 2006).

This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."[14]  <u>Stansbury</u>, 511 U.S. at 323, 114 S. Ct. at 1529; <u>accord</u> <u>United States v. Beltran</u>, 367 Fed. Appx. 984, 988 (11th Cir. 2010) ("Because the test is objective, the subjective beliefs of the defendant and the interviewing officer on

_____

[14]However, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." <u>Stansbury</u>, 511 U.S. at 325, 114 S. Ct. at 1529-30.

22

whether the defendant was free to leave is irrelevant."); <u>United States v. Street</u>, 472 F.3d 1298, 1309 (11th Cir. 2006) (same).  "'[U]nder the objective standard, the reasonable person from whose perspective custody is defined is a reasonable innocent person.'" <u>Street</u>, 472 F.3d at 1309 (citation omitted); <u>see also</u> <u>Brown</u>, 441 F.3d at 1347 (same).

Applying this test to the circumstances in this case, that is, an investigative detention, the Eleventh Circuit Court of Appeals explained:

> [A]lthough a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment-and thus may be deemed to have been "seized" by law enforcement-he will not necessarily be considered in "custody" for Fifth Amendment purposes. . . .
>
> Rather, a "free-to-leave inquiry reveals *only* whether the person questioned was seized.". . . While "seizure is a necessary prerequisite to <u>Miranda</u>, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*."

<u>United States v. Luna-Encinas</u>, 603 F.3d 876, 881 (11th Cir. 2010) (citations omitted and emphasis in original); <u>see also</u> <u>Beltran</u>, 367 Fed. Appx. at 988 (in deciding whether <u>Miranda</u> rights are required prior to questioning during a <u>Terry</u> stop, courts "consider whether the <u>Terry</u> stop 'exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned

23

of his constitutional rights'") (citation omitted); <u>United States v. Ellison</u>, __ F.3d __, __, 2010 WL 1493847, at *2 (1st Cir. April 15, 2010) ("in dealing with a case outside the <u>Miranda</u> paradigm [that is, interrogation of a suspect at the police station], it is essential to recall that 'the freedom-of-movement test identifies only a necessary and not a sufficient condition for <u>Miranda</u> custody[,]'" the district court explained, "[t]hat is, custody under <u>Miranda</u> means a suspect is not free to go away, but a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of <u>Miranda</u>") (quoting <u>Shatzer</u>, __ U.S. at __, 130 S. Ct. at 1224).[15]

"In assessing whether a reasonable innocent person in [Defendant Cooper's] position 'would have understood his freedom of action to have been curtailed to a

_____

[15]The court notes that the Supreme Court in <u>Shatzer</u>, after stating that "<u>Miranda</u> is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated[,]'" stated, "Thus, the temporary and relatively non-threatening detention involved in a traffic stop or <u>Terry</u> stop . . . does not constitute <u>Miranda</u> custody." __ U.S. at __, 130 S. Ct. at 1224 (citations omitted).  However, the facts in <u>Shatzer</u> did not involve a traffic or <u>Terry</u> stop, but whether incarceration in a general prison population, constituted "custody" for purposes of <u>Miranda</u>.  <u>Id.</u> Accordingly, the statement regarding <u>Terry</u> stops appears to be dicta, and while generally true of stops that do not assume, for example, the status of <i>de facto</i> arrests, the court finds that this language does not create a bright-line rule such as suggested by the Government.  [Doc. 116 at 44].  The court finds that each stop and detention should be evaluated – in light of the presumption that such stops usually do not involve "custody" status requiring <u>Miranda</u> warnings – on a case-by-case basis.

degree associated with formal arrest,' . . . [this court] consider[s] the totality of the circumstances, 'including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'" Luna-Encinas, 603 F.3d at 881 (citations omitted); and see Beltran, 367 Fed. Appx. at 988 ("Although officers may restrain an individual's freedom by placing him in the back of a patrol car, in handcuffs, or by pointing guns at him, that restraint does not automatically turn a stop into an arrest."); Blackman, 66 F.3d at 1576 Cir. 1995) (the court stated that the "[Eleventh Circuit Court of Appeals] has said the fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest") (citations omitted). Based on the totality of the circumstances in this case, the court finds that Defendant was not in "custody" requiring Miranda warnings before questioning.

Defendant Cooper was lawfully detained as part of a drug investigation by officers who, for the purpose of securing him and Defendant Rucker, had their firearms briefly drawn. (Tr. at 43-44, 54). Defendant was handcuffed, which as this court previously noted, was reasonable given the nature of the investigation and the fact that Detective Morrison observed the handgun in the passenger compartment of the Lincoln. (Tr. at 39, 40-41). See United States v. Hastamorir, 881 F.2d 1551, 1556

(11th Cir. 1989) (although the officers detained a suspect by the display of firearms and handcuffing, the court declined to find that the detention constituted an arrest and stated, "'the use of a particular method to restrain a person's freedom of movement does not necessarily make police action tantamount to an arrest[; instead, t]he inquiry . . . is reasonableness'") (citation omitted); see also United States v. Day, 591 F.3d 679, 697 (4th Cir. 2010) (finding that due to circumstances, the officers' actions in using "their firearms and handcuffs for their own safety" were "necessary and reasonable" to safeguard the situation and ensure the public safety).  Defendant was advised that he was only being detained.  (Tr. at 56).  And Detective Morrison, who never pointed his firearm at Defendant and had holstered the firearm prior to speaking with Defendant, questioned Defendant, while he remained standing, within the first five minutes of the detention.  (Tr. at 43-44, 52, 56).  The detective's tone of voice was "very laid back"; he did not yell; and he did not threaten Defendant.  (Tr. at 43-45).  Also, the detention occurred in a public parking lot and was observed by civilians standing in the area.  (Tr. at 37-38, 59-60).  These circumstances do not establish that Defendant's "'freedom of action'" was "'curtailed *to a degree associated with formal arrest*.'"  Luna-Encinas, 603 F.3d at 881 (citations omitted and emphasis in original).

In <u>United States v. Acosta</u>, 363 F.3d 1141 (11th Cir. 2004), the Eleventh Circuit Court of Appeals refused to find that the defendant was subjected to a custodial interrogation during a <u>Terry</u> stop.  The court noted that the stop occurred in a parking lot of an apartment complex in broad daylight making the officers' actions visible to anyone in the area.  Although weapons were initially drawn, at the time that the defendant was questioned, all the weapons were holstered, as is true in the case before this court.  <u>Id.</u> at 1150.  And the defendant in <u>Acosta</u> was allowed to remain standing, was not handcuffed and was told that he was not under arrest.  <u>Id.</u>  And, in this case, Defendant also remained standing and was advised that he was being detained, that is, that he was not under arrest.  The fact Defendant was handcuffed does not require a different result.[16]  As was true in <u>Acosta</u>, in the instant case:

> The stop did not involve the type of "highly intrusive" coercive atmosphere that may require <u>Miranda</u> warnings even before a formal arrest is made.  The totality of the circumstances were such that a reasonable person in [Defendant Cooper's] position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else.  No <u>Miranda</u> warnings were required at the time.

---

[16]In <u>Acosta</u>, other types of restraint were placed on the defendant's movements. His driver's license and car keys appear to have been in the officers' possession during the stop, and he was prevented from entering his vehicle on at least one occasion.  <u>Id.</u> at 1147.  Also, the length of the detention in <u>Acosta</u>, approximately twenty minutes, was significantly longer than the five minutes in this case.  <u>Id.</u> at 1147-48.

27

Id. at 1150; see also United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (finding that statements made during a Terry stop were admissible, the court noted that "we have concluded that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes").[17]

The court finds that Defendant was not subjected to a custodial interrogation during first moments of the Terry stop and that Miranda warnings were not required. Defendant's statements are admissible.[18]

## III.    Conclusion

---

[17]The cases cited by Defendant, United States v. Adams, 1 F.3d 1566 (11th Cir. 1993), and Jacobs v. Singletary, 952 F.2d 1282 (11th Cir. 1992), in support of his argument do not require a different result. First, the courts found that Miranda warnings should have been given because "'a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized [so that] he would not feel free to leave.'" Adams, 1 F.3d at 1575 (quoting Jacobs, 952 F.2d at 1291). As stated in Shatzer, that is only the first step in determining whether warnings are required but is not dispositive. And the facts in both cases are distinguishable from the facts in this case as pointed out by the Government. [Doc. 116 at 42-44].

[18]Having found that Defendant's statements are admissible, the court will not address the Government's alternative argument based on the public safety exception. [Doc. 116 at 45-47].

28

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant Cooper's motions [Docs. 85, 86, 112] to suppress be **DENIED** and that Defendant Rucker's motion [Doc. 63] to suppress be **DENIED**.

### Defendant Jackson's Motion to Suppress

Defendant Jackson seeks to suppress evidence seized pursuant to the execution of a search warrant issued by a Magistrate in the Court of DeKalb County, Georgia, on April 7, 2010, for 2626 Oak Shadow Lane, Apartment A, Atlanta, Georgia (The Tempo Hallmark Apartments). [Doc. 82; Doc. 116, Ex. A]. Defendant contends, without offering any legal authority or argument in support, that the affidavit for the warrant does not establish probable cause for the warrant. [Doc. 82]. The Government opposes the motion to suppress contending that the affidavit establishes probable cause.[19] [Doc. 116 at 47-50].

## I.     Search Warrant and Affidavit

The warrant authorized the search of the apartment for controlled substances; paraphernalia; packaging materials; scales or measuring devices; U.S. Currency and other valuables; notes, ledgers or other documents relating to drug offenses; paperwork

---

[19]The Government did not alternatively oppose the motion to suppress citing the good faith exception to the exclusionary rule; accordingly, the court will not address applicability of that exception in this case. [Doc. 116 at 47-50].

29

identifying the occupants; keys; firearms and ammunition; electronic surveillance equipment, computers and cellular phones; and other articles associated with controlled substances crimes or the fruits thereof. [Doc. 116, Ex. A, Search Warrant]. As a result of the warrant's execution, officers seized a black plastic bag containing a block of white powder, a plastic bag containing a green leafy substance, small plastic rubber bands, a black digital scale, razor blades, miscellaneous documents, and a 1IP100 Digital Scale D. [Id.].

In the affidavit in support of the warrant, the affiant stated that officers received information from a confidential source ("CS") about drug trafficking in the Buford Highway area of DeKalb County, and the CS identified 2626 Oak Shadow Lane, Apartment A as the location of the sales. The officers established surveillance at the location, and the affiant stated that at approximately 12:30 p.m., on April 7, 2010, a black 2007 Lincoln Mark arrived at the location and that two black males exited. The affiant stated that each black male removed a duffle bag from the trunk of the Lincoln and entered apartment A. [Doc. 116, Ex. A, Affidavit]. The affiant further stated that at approximately 2:20 p.m., the same two black males exited the apartment, each carrying a duffle bag which was placed in the trunk of the Lincoln. As the black males in the Lincoln attempted to exit the complex, an investigative stop was conducted.

30

[Id.].  The affiant stated that the passenger had a firearm on his person.  When an officer asked if there was anything to be concerned with in the vehicle, the driver said yes.  The driver denied that there were any other firearms in the vehicle but admitted that there were drugs in the vehicle and, when asked, advised the drugs were in the trunk.  [Id.].  The affiant stated that a drug certified K-9 Luca conducted an open air sniff of the Lincoln and alerted to the odor of illegal narcotics in the Lincoln.  In the trunk, after Luca alerted, the officer found the same two duffle bags which contained approximately five kilograms of cocaine which field tested positive, a large amount of U.S. Currency, and an electronic money counter.  [Id.].

## II.    Discussion

In deciding whether to sign a search warrant, the issuing judge is "'simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983)).  In this regard, "'probable cause is a fluid

31

concept–turning on the assessment of probabilities in particular factual contexts[.]'" United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 462 U.S. at 232, 103 S. Ct. at 2329).  For this reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determination." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 462 U.S. at 236-37, 103 S. Ct. at 2331-32; United States v. Ventresca, 380 U.S. 102, 109, 85 S. Ct. 741, 746, 13 L. Ed. 2d 684 (1965)); accord United States v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008).  In reviewing the issuance of the search warrant, the undersigned must determine only that the judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant.  See Gates, 462 U.S. at 238, 103 S. Ct. at 2331; accord Massachusetts v. Upton, 466 U.S. 727, 728, 104 S. Ct. 2085, 2085, 80 L. Ed. 2d 721 (1984) (per curiam).  The validity of the warrant is considered based on the totality of the circumstances.  See Brundidge, 170 F.3d at 1352.

As the Eleventh Circuit Court of Appeals recently affirmed,

AO 72A
(Rev.8/82)

> "[P]robable cause to search a residence exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" . . . "The nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation."

United States v. Tate, 586 F.3d 936, 942-43 (11th Cir. 2009) (quoting United States v. Jenkins, 901 F.2d 1075, 1080-81 (11th Cir. 1990) (citation omitted)).  The facts set forth in the affidavit provide sufficient circumstances to allow the issuing magistrate to conclude that the evidence sought in the warrant would be located in the apartment.  See United States v. Alexander, 574 F.3d 484, 490 (8th Cir. 2009) ("'Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant. . . .'") (citation omitted); United States v. Biglow, 562 F.3d 1272, 1281 (10th Cir. 2009) ("We recognize that magistrate judges are vested with substantial discretion to draw all 'reasonable inferences' from the Government's evidence."); United States v. Wiley, 475 F.3d 908, 916 (7th Cir. 2007) ("'. . . issuing judges are entitled to draw reasonable inferences about where evidence is likely to be found given the nature of the evidence and the type of offense'") (citation omitted).

The facts set forth in the affidavit show that a CS identified the apartment to be searched as the location at which drug trafficking was taking place. [Doc. 116, Ex. A,

33

Affidavit].  Although the affidavit did not provide information about how the CS knew this information or was aware of the location, or, additionally, why he was reliable, the affidavit did set forth the officers' corroboration of that information based on their observations on April 7, 2010.  The affiant stated that two black males arrived at the complex in a Lincoln, removed two duffle bags from trunk of the Lincoln and proceeded to enter the apartment identified by the CS.  [Id.].  Although the affidavit provides no information about what occurred inside the apartment, the affiant states that about an hour after entering, the same two black males exited carrying the two duffle bags which were placed back in the trunk of the vehicle.  [Id.].  And, when the Lincoln and the duffle bags were subsequently searched, officers found kilograms of cocaine, currency and an electronic money counter.  [Id.].  The inference to be reasonably drawn from those facts being that the two black males obtained the cocaine from the apartment for which the warrant was sought – also corroborating the CS's information about the location of drug trafficking.  Therefore, based on the facts set forth in the warrant, this court finds that the DeKalb County Magistrate had a "substantial basis" for concluding that probable cause existed for the search warrant, see Gates, 462 U.S. at 238, 103 S. Ct. at 2331, that is, there was probable cause to

believe that the items sought in the warrant, controlled substances and contraband and fruits of such activity, would be found in the apartment.

However, neither Defendant nor the Government point out that a number of facts, of which the court is aware from conducting the evidentiary hearing in this case, are omitted from the affidavit, including how the CS – and the officers for that matter – knew that the apartment was the location for a drug transaction and how the drugs seized from the Lincoln actually arrived at the apartment and ended up in the Lincoln. The source of that information being monitored conversations between the CS and a co-Defendant, Carlish Parker. [See Doc. 110]. Even though the officer[20] obtaining the warrant apparently deliberately omitted these facts, the court does not find that inclusion of the omitted information would have negated a finding of probable cause in the affidavit.

In Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), the Supreme Court held that where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit, and if the

---

[20]The affiant was Detective D.A. Jackson who was, as the court understands, the officer with the CS during the monitored conversations (Tr. at 28-29), indicating that he was aware of the omitted information.

allegedly false statement was necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request to determine admissibility of the fruits of the search.  Franks, 438 U.S. at 171-72, 98 S. Ct. at 2684-85; United States v. Aisenberg, 358 F.3d 1327, 1333 (11th Cir. 2004).  Franks also applies when the "misinformation" involves omissions from the affidavit "'made intentionally or with a reckless disregard for the accuracy of the affidavit.'" Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997) (quoting United States v. Martin, 615 F.2d 318, 329 (5th Cir. 1980)).  However, "[o]missions that are not reckless, but are instead negligent . . . or insignificant and immaterial, will not invalidate a warrant. . . .  Indeed, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." Id. at 1327 (citations omitted); accord United States v. Owden, 345 Fed. Appx. 448, 454 (11th Cir. 2009) (if the challenge is based on information omitted from the affidavit, then the showing must be that the "'omission was essential to the finding of probable cause'") (citation omitted); Jenkins, 901 F.2d at 1080 (if "[i]nclusion of the allegedly omitted facts . . . would not have precluded the finding of probable cause[,]" then a Franks violation is not established).

36

As outlined in detail *supra* (see Defendants Cooper's and Rucker's Motions to Suppress, I. Facts), the CS approached the officers and advised that he had received cocaine from Parker on prior occasions resulting in the monitored conversations between the CS and Parker to set up the April 7, 2010, transaction.  (Tr. at 5, 19-20). Parker directed the CS to the apartment for the drug transaction which was to take place at approximately 12:30 p.m.  (Tr. at 5-6, 16, 20).  After officers observed Parker arrive and enter that apartment, Parker called the CS and advised that the source of the cocaine was arriving in ten minutes.  Approximately ten minutes later, officers observed Defendants Cooper and Rucker arrive in the Lincoln, remove the two duffle bags from the trunk - both of which appeared to have weight, and carry those duffle bags into the apartment.  Parker then called the CS and advised everything is here. "I've got five."  (Tr. at 6-12, 21-22).  When the officers decided not to conduct the transaction in the apartment and arrangements could not be made to move the transaction, the CS stopped communicating with Parker.  Soon thereafter, Defendants Cooper and Rucker exited the apartment with the two duffle bags – which still appeared to have weight, and placed the bags back into the trunk of the Lincoln.  (Tr. at 11-13, 23-25, 33).  The stop then took place as outlined in the affidavit and at the evidentiary hearing.  (Tr. at 25-28, 37-37-56).

37

These facts indicate, contrary to the inference in the affidavit for the warrant, that Defendants Cooper and Rucker did not obtain the cocaine found in the Lincoln from the apartment. However, the facts also indicate that the officers, independently of the CS's information, knew from the monitored conversations that the apartment, identified by Parker, was to be the site of a drug transaction in which Defendants Cooper and Rucker were to participate. Apparently, this was a location that Defendants felt to be secure. The officers were not relying solely on information provided by the CS. The officers also knew that Parker, and any other occupants of the apartment, were participants in that drug transaction, and based on the information provided by the CS, who was proven reliable by the events of April 7, 2010, the officers knew that Parker had dealt drugs with the CS in the past. Although the drugs that were to be sold to the CS and his associate and had been brought to the apartment by Defendants Cooper and Rucker were removed when the transaction was cancelled, that fact does not defeat the inference that other indicia of drug dealing, such as, packaging, scales, cutting materials, currency, records, or even other controlled substances were in the apartment which was to be the location for the transaction. Accordingly, "[e]ven had the omitted facts been included, probable cause would have

38

existed." <u>Jenkins</u>, 901 F.2d at 1080.  And no <u>Franks</u> violation is established due to the information omitted from the affidavit.

**III.    Conclusion**

For these reasons, the court **RECOMMENDS** that Defendant Jackson's motion [Doc. 82] to suppress evidence be **DENIED**.

## Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant Cooper's motions [Docs. 85, 86, 112] to suppress be **DENIED**; that Defendant Rucker's motion [Doc. 63] to suppress be **DENIED**; and that Defendant Jackson's motion [Doc. 82] to suppress be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial, as to Defendants Carlish Shabazz Parker, Lamar Cooper, Jimmy Rucker, Jr., and Thomas Jackson.

**SO RECOMMENDED AND ORDERED** this 18th day of November, 2010.

39

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)